UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PIERSON LAKES HOMEOWNERS
ASSOCIATION, INC.,

               Reorganized Debtor.

Chapter 11
Case No. 18-22463 (RDD)

---

PIERSON LAKES HOMEOWNERS
ASSOCIATION, INC.,

               Plaintiff

               -against-

PIERSON PROJECT, L.L.C., POTAKE LAKE,
L.L.C., AND ROCK HILL, L.L.C. D/B/A
ROCK HILL PROJECT,

               Defendants.

Adv. Pro. No. 19-08251 (RDD)

---

**MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

Appearances:

KELLEY DRYE & WARREN LLP, by William S. Gyves, Esq., Randall L. Morrison, Jr., Esq.,
and Robert N. Ward, Esq. for Plaintiff Pierson Lakes Homeowners Association, Inc.

MONTALBANO, CONDON & FRANK, P.C. by Richard H. Sarajian, Esq. for Defendants
Pierson Project L.L.C., Potake Lake L.L.C., and Rock Hill L.L.C. d/b/a Rock Hill Project.

Hon. Robert D. Drain, United States Bankruptcy Judge

       This is a dispute over responsibility for maintaining a causeway (the "Causeway"),

including a road on it, that crosses Cranberry Lake, which in turn is located in a residential

development in Sloatsburg, New York.  Defendants Pierson Project, L.L.C., Potake Lake,

L.L.C., and Rock Hill, L.L.C. d/b/a Rock Hill Project (collectively, the "Sponsors") contend that

because the Causeway was included in a parcel of land that they conveyed to plaintiff and

reorganized debtor herein, Pierson Lakes Homeowners Association ("PLHA"), the PLHA has

the maintenance responsibility and, in any event separately assumed that responsibility in a 2004

agreement.  The PLHA denies that the Causeway has been transferred to it and further contends

that under the parties' agreements the Sponsors still have the maintenance responsibility even if

the Causeway was previously transferred to it.

The parties submitted cross-motions for summary judgment on these issues, and this

Memorandum of Decision explains the Court's reasons for (a) granting summary judgment to the

Sponsors insofar as they seek a declaration that PLHA owns the Causeway and the road on it, (b)

granting summary judgment to the Sponsors insofar as they seek a declaration that PLHA

undertook responsibility for maintaining the Causeway under the parties' 2004 agreement, and

(c) granting summary judgment to the PLHA insofar as it seeks a declaration that Potake Lake,

L.L.C. must cause the road on the Causeway to be brought to a proper standard before shifting

the maintenance burden regarding the road to the PLHA, which in any event will not occur until

the first lot in the phase of the development where the Causeway is located is sold.[1]  To the

extent that the parties make contrary arguments in their motions for summary judgment, the

motions for summary judgment are denied with prejudice.

### Procedural Background

On April 19, 2019, the PLHA filed an adversary complaint against the Sponsors seeking

a declaratory judgment as to (i) ownership of the Causeway and (ii) whether the maintenance,

repair, and any required improvements of the Causeway and the road on it are the responsibility

of the PLHA or the Sponsors.[2]  After the Sponsors answered the complaint,[3] the parties

---

[1] Notwithstanding the Court's repeated exhortations to do so, the Sponsors and the PLHA have not specified any
work that needs to be done on the road (or, for that matter, on the Causeway).
[2] ECF No. 1 ("Complaint") ¶ 1.
[3] ECF No. 4 ("Answer").

2

submitted cross-motions for summary judgment,[4] their respective objections to the cross-

motions,[5] and their respective replies.[6]  After hearing initial oral argument,[7] the Court directed

the parties to file supplemental briefs on certain issues.  Having reviewed the parties'

supplemental briefs[8] and replies,[9] the Court again heard oral argument[10] and again directed the

parties to file supplemental briefs on certain new issues that those briefs and the argument raised.

The parties submitted their second supplemental briefs,[11] and the Court heard final oral

argument,[12] after which counsel for PLHA filed a letter confirming the parties agreed answer to

the Court's question about the subdivision map addressed during that argument.[13]

---

[4] *Plaintiff:*  Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment [ECF No. 24];
Declaration of Randall L. Morrison, Jr. [ECF No. 25]; Declaration of Sean Rice [ECF No. 26].  *Sponsors:*  Affidavit
of Luther Gueyikian in Support of Motion for Summary Judgment [ECF No. 29]; Affirmation of Richard Sarajian in
Support of Motion for Summary Judgment [ECF No. 32]; Affirmation of Richard Sarajian in Support of Motion for
Summary Judgment [ECF No. 35].

[5] *Plaintiff:*  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [ECF No.
36]; Declaration of Sean Rice in Opposition to Defendant's Summary Judgment Motion [ECF No. 37].  *Sponsors:*
Defendants' Memorandum of Law in Opposition of Plaintiff's Motion for Summary Judgment [ECF No. 39];
Declaration of Richard Sarajian in Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 40];
Declaration of Luther Gueyikian [ECF No. 41]; Declaration of Richard Sarajian in Opposition to Plaintiff's Motion
for Summary Judgment [ECF No. 43]; Declaration of Richard Sarajian in Opposition to Plaintiff's Motion for
Summary Judgment [ECF No. 44].

[6] *Plaintiff:*  Plaintiff's Reply Memorandum of Law in Further Support of Motion for Summary Judgment [ECF No.
45]; *Sponsors:*  Defendants' Memorandum of Law in Support [of] Defendants' Motion for Summary Judgment
[ECF No. 46]; Reply Declaration of K.M. (Greg) Sarkissian in Support of Motion for Summary Judgment [ECF No.
47].

[7] ECF No. 53 (December 14, 2020 Hearing Transcript).

[8] *Plaintiff:*  Plaintiff's Supplemental Memorandum of Law in Further Support of Its Motion for Summary Judgment
and in Opposition to Defendants' Summary Judgment Motion [ECF No. 62]; Supplemental Declaration of Randall
L. Morrison, Jr. [ECF No. 63]; Supplemental Declaration of Sean Rice [ECF No. 64].  *Sponsors:*  Defendants'
Supplemental Memorandum of Law in Support of Defendants' Motion for Summary Judgment [ECF No. 57];
Supplemental Declaration of Luther Gueyikian [ECF No. 58].

[9] *Plaintiff:*  Plaintiff's Supplemental Reply Memorandum of Law in Further Support of Its Motion for Summary
Judgment and in Opposition to Defendants' Summary Judgment Motion [ECF No. 69].  *Sponsors:*  Defendants'
Supplemental Memorandum of Law in Support of Defendants' Motion for Summary Judgment [ECF No. 66];
Supplemental Declaration of Luther Gueyikian [ECF No. 68].

[10] ECF No. 81 (April 26, 2021 Hearing Transcript).

[11] *Plaintiff:*  Plaintiff's Second Supplemental Memorandum of Law in Further Support of Its Motion for Summary
Judgment and in Opposition to Defendants' Summary Judgment Motion [ECF No. 74]; Second Supplemental
Declaration of Sean Rice [ECF No. 77].  *Sponsors:*  Luther Gueyikian Declaration [ECF No. 75]; Defendants'
Supplemental Memorandum of Law in Support of Defendants' Motion for Summary Judgment [ECF No. 76];
Amended Defendants' Supplemental Memorandum of Law in Support of Defendants' Motion for Summary
Judgment [ECF No. 78].

[12] ECF No. 83 (July 14, 2021 Hearing Transcript).

[13] ECF No. 84.

## Jurisdiction

The Court has jurisdiction over this dispute under 28 U.S.C. §§ 157(a)-(b) and 1334(b).

In their settlement of PLHA's objection to the Sponsors' claims in this chapter 11 case, which

comprised a core proceeding under 28 U.S.C. § 157(b)(2)(B) that was central to the confirmed

chapter 11 plan, the parties reserved this adversary proceeding, which they were not able to settle

as part of that claims dispute, for the Court's determination. They did so under the plan and plan

confirmation order,[14] and therefore the Court has post-confirmation jurisdiction and can decide

the dispute under the U.S. Constitution by a final order.[15]

## Standards for Declaratory Judgment and Summary Judgment

### A. The Declaratory Judgment Act

Under the Declaratory Judgment Act, courts may issue a declaratory judgment only "[i]n

a case of actual controversy."[16] "[T]he phrase 'case of actual controversy' in the Act refers to

the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the U.S.

Constitution.[17] The question to be asked "is whether the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment."[18] The dispute must be "'definite and concrete, touching the legal relations of parties

---

[14] Debtor's Sixth Amended Plan of Reorganization, dated September 12, 2019, Case No. 18-22463 (RDD) [ECF No. 174], at Art. XI(j); *see also* Order Confirming Debtor's Amended Sixth Amended Plan of Reorganization, dated September 13, 2019, Case No. 18-22463 (RDD) [ECF No. 175], at ¶¶ 1, I (each reserving Court's post-confirmation jurisdiction).

[15] *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 681-83 (2015) (consent to determination by final order by the bankruptcy court); *Cohen v. CDR Creances, S.A.S. (In re Euro-American Lodging Corp.)*, 549 Fed. Appx. 52, 54 (2d Cir. 2014); *SP Special Opportunities, LLC v. LightSquared, Inc. (In re LightSquared, Inc.)*, 539 B.R. 232, 240-42 (S.D.N.Y. 2015) (post-confirmation jurisdiction where dispute has close nexus to the chapter 11 plan and the plan and/or confirmation order reserve such jurisdiction).

[16] 28 U.S.C. § 2201(a); *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 126 (2007).

[17] *Indigodental GmbH & Co. KG v. Ivoclar Vivadent, Inc*., 2008 U.S. Dist. LEXIS 101785, at *4 (S.D.N.Y. Dec. 10, 2008) (quoting *MedImmune*, 549 U.S. at 127).

[18] *MedImmune*, 549 U.S. at 127 (internal quotations and citations omitted).

4

having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"[19]

The parties agree, and the Court determines, that their Causeway/road dispute is sufficiently fixed and final to provide the basis for a judicial declaration of the parties' rights and obligations.

### B. Summary Judgment

Fed. R. Civ. P. 56(a), as made applicable to adversary proceedings by Fed. R. Bankr. P. 7056, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law."[20]

The movant has the initial burden of establishing the absence of any genuine issue of material fact.[21] In response, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[22] "Conclusory allegations will not suffice to create a genuine issue."[23] Instead, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."[24] But then the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all

---

[19] *Id*. (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Hassett v. Altai, Inc.* (*In re CIS Corp.*), 214 B.R. 108, 118 (Bankr. S.D.N.Y. 1997).

[21] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[22] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).

[23] *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

[24] *Jaramillo v. Weyerhaeuser Co. and Tech. Licensing Assocs., Inc.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).

reasonable inferences in favor of that party, and to eschew credibility assessments."[25]  If facts are subject to legitimate dispute, they are construed in favor of the non-moving party.[26]  Of course, if the parties do not dispute the material facts and instead disagree on the outcome based on the applicable law, the matter is appropriate for summary judgment.[27]

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law."[28] "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a . . . court is not required to grant judgment as a matter of law for one side or the other."[29]  Rather, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."[30]

## Discussion

The parties rely primarily on their written agreements, including their deed and the incorporated subdivision map memorializing them, and rightly so.  Under New York law, which governs here, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent,' and the best evidence of what parties to a written agreement intend is what they say in their writing.  A court's fundamental objective in interpreting a contract is to determine the parties' intent from the language employed and to fulfill their reasonable expectations.  Where the terms of a contract are clear and unambiguous,

---

[25] *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations and citation omitted); *see also Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007).
[26] *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284-85 (2d Cir. 2005).
[27] *Adirondack Transit Lines, Inc. v. United Transp. Union*, 305 F.3d 82, 84-86 (2d Cir. 2002).
[28] *Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 421 (S.D.N.Y. 2019) (citations omitted).
[29] *Id*. (citation omitted).
[30] *Id*. (citation omitted).

the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole."[31]  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.  Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.  A contract is unambiguous if the language it uses has a definite and precise meaning unattended by danger of misconception in the purport of the [agreement] itself and concerning which there is no reasonable basis for a difference of opinion."[32]

The starting point for construing a deed is § 240(3) of the New York Real Property Law, which similarly provides

> Every instrument creating, transferring, assigning, or surrendering an estate or interest in real property must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument and is consistent with the rules of law.[33]

"The construction of deeds generally presents a question of law for the court to decide, and deeds must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law."[34]  "The 'intent' at issue is the objective intent of the parties manifested by the language of the deed; unless the deed is ambiguous, evidence of unexpressed, subjective intentions of the parties is irrelevant."[35]  "It is

---

[31] *Long Island Med. & Gastroenterology Assoc., P.C. v. Mocha Realty Assoc., LLC*, 191 A.D.3d 867, 859-60 (2d Dept. 2021) (internal quotations and citations omitted); *see also W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990); *Brie Jen Realty Corp. v. Altman*, 146 A.D.3d 744, 746 (2d Dept. 2017); and *Genovese v. Axel*, 40 A.D.3d 693, 694 (2d Dept. 2007) ("Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.") (internal quotations and citations omitted).

[32] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal quotations and citations omitted).

[33] N.Y. Real Prop. Law § 240(3).

[34] *BPGS Land Holdings, LLC v. Flower*, 198 A.D.3d 1344, 1346 (4th Dept. 2021) (internal quotations and citations omitted).

[35] *Modrzynski v. Wolfer*, 234 A.D.2d 901, 902 (4th Dept. 1996) (citing 2 New York Real Property Service, § 20:68, at 78 (1987)).

7

only when language used in a conveyance is susceptible of more than one interpretation that the courts will look into surrounding circumstances, the situation of the parties, etc."[36]  "The settled rule for the construction of such instruments is that all evidence must be excluded which is offered to vary, explain or contradict a written instrument that was complete in itself and without ambiguity in its terms' since, when words in a deed have a definite and precise meaning, it is not permissible to go elsewhere in search of conjecture in order to restrict or extend the meaning."[37]

This has been the rule in New York for more than a century.  In *Muldoon v. Deline*, 135 N.Y. 150 (1892), Muldoon commenced an action against Deline to quiet title to a piece of land. They owned adjoining lots, and both claimed title under the same grantor.  Deline conceded that the disputed land was included within the metes and bounds description of Muldoon's deed but sought to introduce evidence of conversations and negotiations with the grantor and other extrinsic facts to establish that the parties did not intend to include it within that deed.  In affirming the trial court's directed verdict in favor of Muldoon, the Court of Appeals stated:

> There is no ambiguity in the description contained in the plaintiff's deed.  Every line can be surveyed on the ground just as it is given, and the grantor had the land. When the description is applied to the land, no ambiguity is produced, and hence there is no room for parol evidence.  It is true that the intent of the parties to the deed must control.  But that intent must be ascertained from the language contained in the deed. . . . Here there was no patent or latent ambiguity, and no false description which within the rule could be disregarded.[38]

The parties' agreements, their deed, and the subdivision map related to it when placed in the context of the few other undisputed relevant facts warrant the disposition of the parties' disputes on summary judgment as set forth herein.

### The Undisputed Facts

---

[36] *Loch Sheldrake Assocs., Inc. v. Evans*, 306 N.Y. 297, 304-05 (1954) (internal quotations and citations omitted).
[37] *Id*. at 305 (citing *Uihlein v. Matthews*, 172 N.Y. 154 (1902), and cases cited therein).
[38] *Id.* at 152-53.

The following facts, taken from the parties' Local Rule 7056-1(b) Statements,[39] admissions by counsel at oral argument, and pleadings that the Court is permitted to consider when ruling on a motion for summary judgment, are undisputed.  If the Court cites to a party's statement of undisputed facts or response thereto, it is because there is no dispute between the parties about the fact referred to in such citation.

### 1.  Background:  The Pierson Lakes Development

During the 1980s the Sponsors' predecessor, Ramapo Land Co., Inc. ("RLC") owned certain parcels of land in Sterlington, Town of Ramapo, County of Rockland, New York.[40]  RLC received approval to develop the land under the name Pierson Lakes.[41]  As part of the development, RLC formed the PLHA for the purpose of owning, operating, and maintaining the common areas and improvements of the Pierson Lakes development.[42]

### 2.  The Offering Plan

RLC prepared, submitted, and had accepted by the Office of the New York State Attorney General an offering plan dated August 2, 1989 (the "Offering Plan").[43]  The Offering Plan divided the Pierson Lakes property into three "phases,"[44] with each phase containing a projected number of building lots together with common areas and improvements.[45]

---

[39] The parties filed the following Local Rule 7056-1-(b) Statements:  Plaintiff's Statement of Undisputed Material Facts [ECF No. 27], Defendants' Statement of Undisputed Material Facts [ECF No. 30], Plaintiff's Response to Defendants' Statement of Undisputed Material Facts [ECF No. 38], Defendants' Response to Plaintiff's Statement of Undisputed Material Facts [ECF No. 42], Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts [ECF No. 48], Defendants' Supplemental Statement of Undisputed Material Facts on the Issue of Maintenance of the Causeway [ECF No. 59], Plaintiff's Supplemental Statement of Undisputed Material Facts [ECF No. 65], Defendants' Response to Plaintiff's Supplemental Statement of Undisputed Facts [ECF No. 67], and Plaintiff's Response to Defendants' Supplemental Statement of Undisputed Material Facts on the Issue of Maintenance of the Causeway [ECF No. 71].

[40] ECF No. 38 (Plaintiff's Response to Defendants' Statement of Undisputed Material Facts) ¶ 5.

[41] *Id*. ¶ 6.

[42] *Id*.

[43] *Id*. ¶ 10.

[44] *Id*. ¶ 11.

[45] *Id*. ¶¶ 12-13.  Sometimes these three "phases" are referred to in the record using roman numerals, sometimes using Arabic numerals.  This Memorandum of Decision uses Arabic numerals except when quoting a document.

9

Although the Offering Plan does not specifically mention the Causeway, in describing the

common areas and when they would be transferred to the PLHA it provides clear guidance for

resolving much of the parties' dispute.  That description follows:

### DESCRIPTION OF COMMON AREAS AND FACILITIES
### TO BE OWNED OR MAINTAINED BY THE HOMEOWNERS ASSOCIATION

1.    SITE
                                        ***

The Common Areas which [RLC] will convey to the [PLHA] will include
approximately 97 acres in Phases 1 and 2 and approximately 354 acres in Phase 3.
The Common Areas, which will be owned and maintained by the [PLHA], will
include common open space, Cranberry Lake and the New York portion of Potake
Lake, two dams, wetlands, roads, hiking trails and bridle paths as well as the
improvements described below which are discussed more fully in the Exhibit I
Engineer's Description of The Property.

                                        ***

4.    Streets and Roadways

    All private streets and roads in the Development will be owned and
maintained by the [PLHA].  All street work, materials, construction methods and
workmanship in the Development will conform with specifications approved by
the Town of Ramapo as follows . . . .

                                        ***

6.    Lakes and Dams

    1)  Cranberry Lake:  Drainage area is 2.36 square miles with 800 acre-feet
        of storage, lake surface area of 103 acres, 2.5 miles of shoreline, a
        broad crested concrete spillway 205 feet long, regulated outlets
        through the dam, a naturally boulder paved downstream channel, an
        Amburssen-type (buttressed) reinforced concrete dam 139 feet long by
        2.5 feet wide at the crest, 45 feet wide at the base and 29 feet wide at
        the center with reinforced concrete upstream sloping deck, nine bays,
        three-feet wide upstream wing walls, spillway elevation at 514.5
        USGS, and top of dam elevation at 517.2.  The dam and appurtenances
        were constructed on or about 1920.

                                        ***

(collectively, the "Common Areas").[46]

Private roads traverse the Pierson Lakes development, including Sterlington Road.[47] That road connects Phase 1 of Pierson Lakes to Phase 3[48] after crossing Cranberry Lake on the Causeway.[49] The Causeway and the portion of Sterlington Road on it are located within Phase 3 of the Pierson Lakes development.[50]

That latter fact is important because the Offering Plan provides that RLC "<u>will . . . deed the Common Areas in Phase 3 to the [PLHA] . . . prior to the closing of title to the first Lot in Phase 3</u> . . . ."[51]  That is, the Common Area in Phase 3 does not become "owned and maintained" by the PLHA under the original Offering Plan until "prior to the closing of title to the first Lot in Phase 3," which, as discussed below, the rest of the Offering Plan and the parties' other agreements make clear will occur immediately before such closing.  Counsel for the Sponsors acknowledged this point at oral argument.[52]  At least by implication, then, under the original Offering Plan the Common Areas in Phase 3, which at least include the roads in Phase 3 including that portion of Sterlington Road on the Causeway, remained owned by and the responsibility of the sponsor/developer before that time.

The parties agree that the closing of title to the first lot in Phase 3 has not yet occurred and apparently is not imminent.[53]

---

[46] ECF No. 29 (Affidavit of Luther Gueyikian in Support of Motion for Summary Judgment (the "Gueyikian Aff.")), Ex. C, pp. 14-16 (emphasis added).
[47] ECF No. 42 (Defendants' Response to Plaintiff's Statement of Undisputed Material Facts) ¶ 25.
[48] *Id*. ¶ 27.
[49] *Id*. ¶ 26.
[50] *Id*. ¶ 28.
[51] Gueyikian Aff, Ex. C, p. 3 (emphasis added).
[52] ECF No. 81 (April 26, 2021 Hearing Transcript) at p. 20:15-23, "The Court:  Let's assume for the moment it was not transferred in 2004 to the homeowners association.  When would the event occur that would result in the transfer?  Mr. Sarajian:  Your Honor, Richard Sarajian here.  I think we put in our papers we have enough improvements in to sell lots in Phase 3.  The Court:  Right.  Mr. Sarajian:  So it could happen when we get a buyer."
[53] *Id.*

### 3.   The Declaration of Covenants, Restrictions, Easements, Charges and Liens

A 1989 Declaration of Covenants, Restrictions, Easements, Charges and Liens (the

"Declaration") governs the real property within the Pierson Lakes development.  Article I(b)

defines "Common Areas" to mean and refer:

> to those areas of land together with the facilities thereon, which are designated as
> such on the subdivision map of the Properties prior to the conveyance of title to a
> purchaser for value of the first Lot within a particular Phase.  The Common Areas
> are intended to be devoted to the common use and enjoyment of the Members of
> the Association as herein defined, and are not dedicated for use by the general
> public.[54]

Article IV, titled "Property Rights in the Properties," provides:

> Section 2.  Title to Common Areas.  Prior to the conveyance of title to a purchaser
> for value of the first Lot in any Phase of the Properties, [RLC] shall convey legal
> title to the Common Areas situated within the Phase to the [PLHA] subject,
> however, to the following covenant which shall be deemed to run with the land
> and shall be binding upon the [PLHA], its successors and assigns:

>> In order to preserve the enhance the property values and amenities of the
>> Development, the Common Areas and all facilities now or hereafter built
>> or installed thereon, shall at all times be maintained in good repair and
>> condition and shall be operated in accordance with high standards.  The
>> maintenance and repair of the Common Areas shall include, but not be
>> limited to, the maintenance and repair of damage to roadways, the
>> landscaped entranceway, the security gatehouse, the guardhouse, the
>> boathouse, the fire protection system, the lakes, dams and spillways, the
>> hiking trails, walking and bridle paths, the common storm and sanitary
>> disposal systems and the sewer systems, as well as signs and fencing.

>> *                    *                    *

> This Section shall not be amended, as provided for in Article XI, Section 2, to
> reduce or eliminate the obligation for maintenance and repair of the Common
> Areas.[55]

Under the Declaration, therefore, the Common Areas "and all facilities now or hereafter built or

installed thereon," are under a covenant running with the land to "be maintained in good repair

---

[54] ECF No. 26 (Declaration of Sean Rice (the "Rice Decl.")), Ex. 3, at pp. 2-3 (emphasis added).
[55] Id. at p. 7 (emphasis added).

and condition and shall be operated in accordance with high standards," and that covenant shall

be binding on the PLHA upon the transfer of the Common Areas prior to the transfer of the first

lot within the Phase in which such Common Areas are located.  The Declaration also provides

that the foregoing maintenance and repair obligation "shall include but not be limited to, the

maintenance and repair of damage to roadways."[56]  Thus the Declaration makes it clear that the

Common Areas include all "facilities" thereon, which not only expressly includes the roads

thereon but reasonably would include the Causeway that Sterlington Road traverses.  It also can

be reasonably inferred from Section 2 that the level of maintenance obligation would exist before

the transfer of a Common Area to the PLHA and thus until that transfer would be sponsor,

RLC's, responsibility.

### 4.  The Homeowners Litigation

In January 1999, PLHA and some of its members filed a lawsuit in New York Supreme

Court, Rockland County against RLC (the "Homeowners Litigation").[57]  The Homeowners

Litigation arose out of RLC's alleged obligation to provide certain amenities to Pierson Lakes

homeowners, as well as the PLHA's demand, notwithstanding that RLC had not yet closed title

to the first lots in Phases 2 and 3, to own the Phase 2 and Phase 3 Common Areas, including

Cranberry Lake.[58]

Although in January 2003, the parties to the Homeowners Litigation settled some of their

claims, PLHA's claim to own all of the Phase 2 and Phase 3 Common Areas was unresolved.[59]

---

[56] *Id.*
[57] *Id.* ¶ 54.
[58] *Id.* ¶ 55.
[59] *Id.*

As part of the settlement, RLC agreed to make some improvements within the Pierson Lakes development[60] including:

> 1.                          ***

>     e.       Install upon the causeway, where Sterlington Road crosses Cranberry Lake, an additional one and one-half (1½") inches of asphalt paving over the existing concrete surface.  Additionally, the guard rails shall be replaced to improve and enhance pedestrian safety in that area.  This will be completed no later than thirty days from the effective date of this stipulation.

The same agreement provided that

> 3.   The [PLHA] and the individual Plaintiffs in this litigation hereby agree that the items set forth in Paragraph 1 hereof are the only unfulfilled obligations of the Sponsor for Phase I, pursuant to the Offering Plan for Pierson Lakes,[61]

but, as noted, the Causeway is located in Phase 3 of the development, not in Phase 1.  Therefore it would appear that in respect of the Causeway the parties agreed only that RLC would add the paving and guardrails and in so doing did not alter RLC's other maintenance and repair obligations.  (The same agreement also provided for the PLHA to give "a general release [to RLC], in the usual form," but the release was expressly limited to specifically listed claims in the complaint that did not pertain to the Causeway of Phase 3.)[62]

### 5.   The Sponsors Acquire the Pierson Lakes Development from RLC

In May 2001, RLC and Sponsor Pierson Project, L.L.C. entered into an Agreement of Sale under which Pierson Project, L.L.C. acquired nine unsold lots in Phase 1, the Phase 2 lot, and the right to purchase Phase 3.[63]  In the sale agreement, RLC represented that "Cranberry Dam, the spillway and its associated swales are part of Phase III" and that RLC for the time being would remain the sponsor of Phase 3 "and shall be responsible for any required repairs and

---

[60] *Id.* ¶ 62.
[61] Gueyikian Aff., Ex. M, pp.4-5.
[62] *Id.*, p.6.
[63] ECF No. 42 (Defendants' Response to Plaintiff's Statement of Undisputed Material Facts) ¶¶ 63-64.

maintenance of the dam and spillway . . . unless and until [Pierson Project, L.L.C.] or an

affiliated party of [Pierson Project, L.L.C.] or any other party acquires Phase III[.]"[64]  RLC

further agreed to perform all repairs to the Cranberry Lake dam infrastructure authorized by a

permit it had obtained from the New York State Department of Environmental Conservation to

take certain steps "for the rehabilitation" of the dam and spillway.[65]  In Section 19 of the Sale

Agreement, Pierson Project, L.L.C. acknowledged that it "intends to purchase the proposed

Phase III" subject to certain closing contingencies, including RLC's "completion of the repairs to

the Dam and Spillway at Cranberry Lake[.]"[66]

In an agreement with the PLHA dated March 27, 2002, the Sponsors clarified their

plans for the Pierson Lakes development.[67]  Specifically:

1. The purchasing entity that will take title to and develop Phase I shall be
   Pierson Project, L.L.C.  The purchasing entity that will take title to and
   develop Phase II of the Property shall be Rock Hill, L.L.C.  For purposes of
   the Agreement, the definition of "New Sponsor" shall now collectively refer
   to Pierson Project, L.L.C. and Rock Hill, L.L.C.; however, Pierson Project
   L.L.C. shall have all rights and obligations only as to Phase I of the Premises
   and Rock Hill, L.L.C. shall have all rights and obligations only as to Phase II
   of the Premises.

2. <u>New Sponsor may choose to also purchase Phase III of the Premises.  In that
   event, the purchasing entity that will take title to and develop Phase III of the
   Property shall be Potake Lake, L.L.C.,</u> the definition of "New Sponsor" shall
   then collectively refer to Pierson Project, L.L.C., Rock Hill, L.L.C. and Potake
   Lake, L.L.C., <u>and Potake Lake, L.L.C. shall have all rights and obligations
   only as to Phase III of the Premises.</u>[68]

Thus the Sponsors' obligations in respect of Phase 3, including presumably the Phase 3 Common

Areas, were limited to Potake Lake, L.L.C.

---

[64] *Id*. ¶ 65.
[65] *Id*. ¶¶ 66-67.
[66] *Id*. ¶ 68.
[67] *Id*. ¶ 71.
[68] *Id*. ¶ 72; Rice Decl., Ex. 9, p. 3 (emphasis added).

**6.  The 2004 Agreement to Convey the Cranberry Lake, Dam and Spillway Parcel to PLHA**

On April 6, 2004, PLHA and the Sponsors entered into an agreement (the "2004 Agreement") to address issues raised in the Homeowner Litigation that were not resolved by the earlier settlement agreement.[69]  Importantly, in the 2004 Agreement, Potake Lake, L.L.C. agreed, notwithstanding that the first lot in Phase 3 had not been sold:

> [T]o transfer the title of Cranberry Lake and the property within Phase III containing the dam and the spillway for Cranberry Lake (together "the Cranberry Lake, Dam and Spillway Parcel") to the PLHA when the final subdivision of Phase III has occurred pursuant to Section 9 of this Agreement.[70]

The parties further agreed that upon final approval of the Phase 3 subdivision, Potake Lake, L.L.C. would:

> convey to PLHA, and PLHA agrees to accept, title to the Cranberry Lake, Dam and Spillway Parcel by Bargain and Sale Deed with covenant against grantor's acts (the "Cranberry Lake, Dam and Spillway Deed").[71]

The 2004 Agreement further provided that:

> 5.    The Cranberry Lake, Dam and Spillway Deed shall be subject to the Declaration of the [PLHA] and those other matters specified in the Public Offering Plan.  In this regard, the Deed for Cranberry Lake shall include a reservation to [Potake Lake, L.L.C.], for the benefit of [Potake Lake, L.L.C.] and its successors in interest to the Phase III Premises, of those matters referred to in the Public Offering Plan as the Sponsor may require for the development of all phases of the Pierson Lakes Development, including, but not limited to:
>
> (a)    the right to construct, up-grade, widen and re-align the existing road across the "causeway" which may be required for the development of Phase II and III of the Pierson Lakes Development;
>
> (b)    the right to widen the existing roads, including possible slope stabilization and possible filling, installation of piles and/or bank stabilization of Cranberry Lake along Sterlington Road, which may be required for the development of Phase II and III of the Pierson Lakes Development;

---

[69] Id. ¶ 73.
[70] Id. ¶ 76 (emphasis added).
[71] Id. ¶ 77 (emphasis added).

(c)        the right to use Cranberry Lake as the primary source of water for the fire protection system for all phases of the Pierson Lakes Development: and

(d)        the rights under the forty (40') foot wide slope stabilization easements for both the road along the causeway and through the existing AT&T easement as set forth in the Offering Plan and the installation of utilities as may be required in the construction and development of Phase III.[72]

The 2004 Agreement also addressed certain funds that the PLHA was holding in its dam maintenance reserve:

8.  (a)  Whereas, the sum of $271,126.00, represents the PLHA's dam maintenance reserve as of December 31, 2001 and the PLHA previously has agreed to pay this amount to [RLC] by reason of:  (i) the repairs made by [RLC] to the dam and spillway, which Ramapo represented had been completed by Ramapo in accordance with DEC Permit No. 3-3926-00182/00005 dated April 3, 2001 (except for completion of emergency de-watering facilities at the dam, and (ii) [RLC] conveying Cranberry lake and the dam and spillway to [PLHA] and (iii) [RLC] making the advance of the sum of $35,000 described in Section 10 hereof, accordingly, [Potake Lake, L.L.C.] anticipates paying $271,126.00 to [RLC] at the Phase III Closing on behalf of the PLHA.  In light of the foregoing, within ten (10) days after the Closing on Phase III, PLHA shall deliver to its counsel, Rothschild & Pearl, LLP the sum of $271,126.00 to be held by Rothschild & Pearl in escrow in an interest bearing account.

(b)  Provided [Potake Lake, L.L.C.] has delivered to Rothschild & Pearl (i) the final form of the Cranberry Lake, Dam and Spillway Deed for recording pursuant to Section 9 of this Agreement, (ii) proof of payment by [Potake Lake, L.L.C.] to [RLC] of the $271,126.00, and (iii) an indemnification from Potake LLC to PLHA against any claims made by [RLC] for the payment of said $271,126.00, Rothschild & Pearl shall simultaneously release to [Potake Lake, L.L.C.] the sum of $271,126.00.[73]

Thus the $271,126 in escrow would be released upon the delivery to the escrow agent of the Cranberry Lake, Dam and Spillway Deed for recording along with the satisfaction of the other conditions in section 8(b).

---

[72] *Id*. ¶ 78; Rice Decl., Ex. 10, p. 4 (emphasis added).
[73] *Id*. ¶ 81; Rice Decl., Ex. 10, pp. 5-6.

As noted, the parties agreed that the transfer of the Cranberry Lake, Dam and Spillway

Parcel to PLHA under the 2004 Agreement would take place when the final subdivision of Phase

I3 occurred under section 9 of the 2004 Agreement.  That section provides:

> 9.  Within ten (10) days after the Closing on Phase III, [Potake Lake,
> L.L.C.] shall deliver the initial form of the Cranberry Lake Dam and Spillway
> Deed in the form attached hereto as Exhibit A to Rothschild & Pearl LLP,
> together with a bill of sale for the Dam and Spillway, each to be held in escrow
> pending completion of the subdivision of the Cranberry Lake, Dam and Spillway
> Parcel as a separate lot or lots.  The bill of sale shall be released from escrow
> whenever the final form of Deed is released for recording in accordance with this
> Section 9.  Upon completion of the subdivision, Rothschild & Pearl LLP may
> immediately release the said Deed from escrow and record same provided that the
> subdivision is consistent with the description of the Parcel as set forth in Exhibit
> A, in which case said Deed shall be considered the final form of Deed and the
> $271,126.00 shall be released in accordance with Section 8 hereof.  [Potake Lake,
> L.L.C.] agrees that, in the event a corrective description becomes necessary due to
> a variation in the property description in the approved subdivision, [Potake Lake,
> L.L.C.] shall immediately provide such corrective deed to Rothschild & Pearl
> LLP whereupon such Deed shall be considered the final form of Deed, the
> $271,126.00 shall be released in accordance with Section 8 hereof and Rothschild
> & Pearl LLP may immediately record the Deed.

Section 9 also provided, as to the parties' maintenance and repair obligations,

> Upon [Potake Lake, L.L.C.'s] delivery of the initial form of the Cranberry Lake
> Dam and Spillway Deed in the form attached hereto as Exhibit A to Rothschild &
> Pearl LLP to be held in escrow as aforesaid, the PLHA shall assume, shall be
> deemed to have assumed, and shall be solely responsible for all rights and
> obligations, including maintenance and repair obligations for Cranberry Lake, the
> Cranberry Lake dam, the spillway, and all appurtenant facilities without execution
> of any further documents.  Neither Pierson nor Rock Hill nor [Potake Lake
> L.L.C.] shall thereafter have any obligations with respect to Cranberry Lake and
> the Cranberry Lake dam and spillway other than as lot(s) owners.[74]

It is this provision over which the parties have primarily disagreed when arguing about

their maintenance and repair issues.

### 7.  The Bargain and Sale Deed

---

[74] *Id*. ¶ 84; Rice Decl., Ex. 10, p. 6 (emphasis added).

As contemplated by the 2004 Agreement, under a Bargain and Sale Deed With

Covenants Against Grantor's Acts (the "Bargain and Sale Deed") dated April 6, 2004 Potake

Lake, L.L.C. granted to the PLHA:

> ALL that certain plot, piece or parcel of land, <u>with the improvements thereon</u>
> erected, situate, lying and being in the Town of Ramapo, County of Rockland and
> State of New York, constituting Cranberry Lake, Dam and Spillway Parcel <u>being</u>
> <u>more particularly described on Schedule "A" annexed hereto</u> (the "Premises").[75]

Schedule A to the Bargain and Sale Deed reads:

**<u>SCHEDULE A</u>**

**<u>Cranberry Lake, Dam and Spillway Parcel(s)</u>**

> (Preliminary Metes & Bounds to be included in Deed being executed for holding
> in escrow within 10 days of Closing on Phase III)[76]

The actual metes and bounds referenced in Schedule "A" does not appear to have been set forth

until the submission of the completed subdivision map, described below, on or about January 20,

2014 by counsel for the Sponsors for recording.

### 8.   The Bill of Sale

A bill of sale dated April 14, 2004 (the "Bill of Sale") provides that Potake Lake, L.L.C.

"hereby has bargained and sold, and by these presents does remise, release and quit claim unto"

the PLHA:

> All of the right, title and interest of Potake Lake L.L.C. in and to the Cranberry
> Lake Dam and Spillway <u>and all appurtenances relating thereto</u> belonging to
> Potake Lake, L.L.C. free and clear of all liens and encumbrances.[77]

### 9.   Potake Lake, L.L.C. Closes on Phase 3 with RLC; Sixteenth Amendment to
### Offering Plan

---

[75] *Id*. ¶ 88; Rice Decl., Ex. 11, p. 1 (emphasis added).  The parties use the terms "Cranberry Lake Dam and Spillway
Deed" and "Bargain and Sale Deed" interchangeably to refer to the deed from Potake Lake, L.L.C. to the PLHA
dated April 6, 2004.
[76] Rice Decl., Ex. 11, p. 5.
[77] *Id*., Ex. 12 (emphasis added).

19

On April 7, 2004, Potake Lake, L.L.C. acquired Phase 3 from RLC,[78] recording the deed

from RLC to Phase 3 on April 26, 2004.[79]  As noted, Cranberry Lake and the Causeway lie

within Phase 3.[80]

In a July 23, 2004 amendment to the Offering Plan (the "Sixteenth Amendment"), Potake

Lake, L.L.C. confirmed that it had acquired title to and was the successor sponsor of Phase 3.[81]

The Sixteenth Amendment reflects that the PLHA assumed "all rights and obligations, including

maintenance and repair obligations for Cranberry Lake, Dam and Spillway and all appurtenant

facilities" (emphasis added), and the Sponsors "shall not have any obligations with respect to

Cranberry Lake, Dam and Spillway other than as Lot Owners."[82]

The parties' respective rights and obligations regarding the ownership of, and

responsibility for, the Causeway are reflected in the 2004 Agreement, the Bargain and Sale

Deed, the Bill of Sale and the Sixteenth Amendment (collectively, the "Controlling

Documents").

### 10. The Final Subdivision Map, Metes and Bounds Description, and Delivery of the Bargain and Sale Deed

The final subdivision map for Phases 2 and 3 was filed in the Office of the Rockland

County Clerk on September 10, 2013 as Map Nos. 8212-8221 (the "Final Map").[83]  The Final

Map's Title Sheet contains a list of "General Notes."[84]  Note 28 states:

> "The roads and improvements are private and not to be dedicated now, or in the
> future, to the Town of Ramapo.  The road improvements with all Town standards
> or specifications applicable to public roads except for pavement width.  The

---

[78] ECF No. 42 (Defendants' Response to Plaintiff's Statement of Undisputed Material Facts) ¶ 93.
[79] *Id.* ¶ 95.
[80] *Id.* ¶ 94.
[81] *Id.* ¶ 96.
[82] *Id.* ¶ 98 (emphasis added).
[83] ECF No. 38 (Plaintiff's Response to Defendants' Statement of Undisputed Material Facts) ¶ 93; Gueyikian Aff., Ex. EE.
[84] Gueyikian Aff., Ex. EE, p. 1.

ownership and maintenance of all roads will be the responsibility of [PLHA], its successors or assigns."[85]

Final Map page 8217 (Part 4 of 8) depicts Cranberry Lake and its environs.[86]  Note 13 states that the individual lots are depicted with the tax lot # shown inside □.[87]  The tax lot # shown on the Final Map for Cranberry Lake is 46.7-1-15.[88]  Cranberry Lake is identified as "H.O.A. Common Area #9".[89]

By letter dated January 20, 2014, Potake Lake, L.L.C., by its attorney Richard H. Sarajian, Esq., sent notice to the PLHA and the Escrow Agent that the final subdivision map was filed and asked them to comply with the 2004 Agreement by completing the release from escrow of the Bill of Sale and Bargain and Sale Deed and filing the Bargain and Sale Deed.[90]  Mr. Sarajian wrote:

> I enclose herewith a copy of the April 6, 2004 Agreement (the "Agreement) between the HOA and Pierson Project LLC, Rock Hill LLC and Potake Lake LLC.  I also enclose a copy of the Deed and Bill of Sale placed in escrow.
>
> In addition, I enclose:
>
> (a) A title report for the property covered by that Deed,
> (b) Metes and Bounds description,
> (c) RP-5217, and
> (d) TP-584.
>
> The Metes and Bounds description has been sent to the title company for review.
>
> As you know, the TP-584 and RP-5217 must be prepared online in a scannable format.  Please confirm the information is correct and fill in any missing information so I can complete that document.

---

[85] *Id.*
[86] *Id.*, p. 6.
[87] *Id.*, p. 1.
[88] *Id.*, p. 6.
[89] *Id.*
[90] ECF No. 75 (Luther Gueyikian Declaration (the "Gueyikian Decl.")), Ex. K

Pursuant to the April 6, 2004 Agreement, your client is entitled to receive title to Cranberry Lake.[91]

The preamble to the Metes and Bounds description reads:

All that certain plot, piece or parcel, situate, lying and being in the Town of Ramapo, County of Rockland and State of New York, shown and designed as H.O.A. Common Area #9 and tax lot 46.7-1-15 on a map titled "Final Subdivision Plat Prepared for Pierson lakes Town of Ramapo Rockland County New York" that was filed in the Rockland County Clerk's Office on September 10, 2013 as Map No. 8212

Together with the benefits and SUBJECT TO the obligations set forth in a certain Declaration of Covenants, Restrictions, Easements, Charges and Liens dated April 25th, 1900 and recorded in the Rockland County Clerk's Office on May 11th, 1900 in Liber 408 of Land Records, Page 1110 and any amendments thereto.[92]

The TP-584[93] prepared by Mr. Sarajian provides, in relevant part:[94]

**Location and description of property conveyed**

| Tax map designation – Section, block & lot *(include dots and dashes)* | SWIS code (six digits) | Street address | City, town or village | County |
|---|---|---|---|---|
| 46.7-1-15 | 392689 | Sterlington Rd | Sloatsburg Town of Ramapo | Rockland |

The RP-5217[95] prepared by Mr. Sarajian provides, in relevant part:[96]

ASSESSMENT INFORMATION – . . . New Lot – No Assessment

16. Year of Assessment Roll from which information taken (YY) _____      17. Total Assessed Value _____

18. Property Class _____      19. School Dist [] Ramapo Central

20. Tax Map Identifier(s) Roll Identifier(s) (If more than four attach sheet with additional Identifier(s):

_____ 46.7-1-15 _____

---

[91] *Id.*
[92] *Id.*, p. 26.
[93] TP-584 - Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax.
[94] Gueyikian Decl., Ex. K, p. 36.
[95] RP-5217 – NYS Department of Taxation and Finance Real Property Transfer Report.
[96] Gueyikian Decl., Ex. K, p. 40.

The metes and bounds include Cranberry Lake and, accordingly, the Causeway that crosses it.[97]  At the July 14, 2021 hearing, Mr. Sarajian confirmed without dispute that the PLHA's dam maintenance reserve in the amount of $271,126 had been released to the PLHA pursuant to paragraphs 8 and 9 of the 2004 Agreement.[98]

Notwithstanding that the conditions for recording the Bargain and Sale Deed under section 9 of the 2004 Agreement – the delivery of the initial form of the Bargain and Sale Deed and the completion of the final subdivision of Phase 3 as set forth on the recorded Final Map – had been satisfied (as further confirmed by the release of the $271,126), the Bill of sale and Bargain and Sale Deed have not been released and the Escrow Agent has not recorded the Bargain and Sale Deed.[99]

## A.  Ownership of the Causeway

It is clear from the Controlling Documents and the Final Map that, no later than the January 20, 2014 satisfaction of the conditions to the release of the Bill of Sale and Bargain and Sale Deed from escrow and for the recording of the Bargain and Sale Deed, under section 9 of the 2004 Agreement, PLHA became the owner of the Causeway.

The PLHA's only argument to the contrary is that the definition of the "Cranberry Lake, Dam and Spillway Parcel" in the 2004 Agreement and Bargain and Sale Deed did not specifically reference the Causeway, and the Causeway could not be construed as an "an "appurtenance" relating to the lake under the Bill of Sale.[100]  The Sponsors contend, to the

---

[97] At the final hearing on the summary judgment motions, an issue arose regarding a difficult-to-read notation on the map that arguably could describe a different tax parcel for the Causeway. ECF No. 83 (July 14, 2021 Hearing Transcript), at pp.6-7, 9, 12.  In a joint letter to the Court dated August 9, 2021, however, the parties confirmed that the problematic notation discussed at the July 14, 2021 hearing "is unrelated to the conveyance of the [C]auseway and has nothing to do with the ownership issue."  ECF No.84.

[98] ECF No. 83 (July 14, 2021 Hearing Transcript), at p. 18.

[99] ECF No.42 (Defendants' Response to Plaintiff's Statement of Undisputed Material Facts) ¶ 101.

[100] *See supra* note 77.  The PLHA's related contention that its interpretation is supported by its view of the circumstances surrounding the 2004 Agreement – that it allegedly was interested only in acquiring control of

contrary, that the Causeway *should* be viewed as such an "appurtenance" relating to Cranberry

Lake under the Bill of Sale and, in any event, that the Bargain and Sale Deed includes all

"improvements" to the Cranberry Lake, Dam and Spillway Parcel,[101] which would include the

Causeway.  Ultimately, however, the outcome of the ownership dispute depends less on the

parties' sparring over the meaning of an "appurtenance" or "improvement" – although the

Sponsors have the better of those arguments – than on the scope of the Bargain and Sale Deed,

the metes and bounds description of the transferred property, and the Final Map.

Under N.Y. Real Prop. Law § 240(3) and the case law construing it, the Court must look

only to the parties' objective intent manifested by the plain language of their Deed.  The PLHA

does not dispute that on January 20, 2014 it received from Mr. Sarajian the final form of the

Bargain and Sale Deed and a metes and bounds description of the property conveyed under the

2004 Agreement.  That metes and bounds description is precise and unambiguous.  The parties'

intention to convey the entirety of the parcel, which would include the Causeway within it unless

the Causeway were specifically carved out, is made even clearer by the Bargain and Sale Deed's

statement that the conveyance of "ALL that certain plot, piece or parcel of land, with the

improvements thereon erected . . . ."  *See also* the Bill of Sale (transferring "All of the right, title

and interest of Potake Lake, L.L.C. in and to the Cranberry Lake Dam and Spillway . . .") and the

metes and bounds description ("All that certain plot, piece or parcel, situate, lying and being in

the Town of Ramapo . . .").

---

Cranberry Lake and the aging dam and its infrastructure -- cannot be considered under New York law's rules for
interpreting unambiguous deeds, discussed above.
[101] *See supra* note 75.

"Generally, the most important indicator of a grantor's intent is the appearance of a subdivision map and the language of the original deeds."[102]  As a rule, a map which is referenced in a deed controls the distances stated therein.[103]  "The map must be taken as part of the deed and controls the description."[104]

Here, the Final Map is directly referenced in the metes and bounds description and evidences the Sponsors' intent to convey the whole of the property described as:

> All that certain plot, piece or parcel, situate, lying and being in the Town of Ramapo, County of Rockland and State of New York, shown and designed as H.O.A. Common Area #9 and tax lot 46.7-1-15 on a map titled "Final Subdivision Plat Prepared for Pierson lakes Town of Ramapo Rockland County New York" that was filed in the Rockland County Clerk's Office on September 10, 2013 as Map No. 8212

It is undisputed that Cranberry Lake is designated on the Final Map filed September 10, 2013 as H.O.A. Common Area #9.  The Final Map places the Causeway (labeled on the Final Map as "bridge") inside the boundaries of Cranberry Lake and therefore within H.O.A. Common Area #9.  It is further undisputed that the metes and bounds description given to the PLHA with the Bargain and Sale Deed on January 20, 2014 specifically describes the property to be conveyed as "H.O.A. Common Area #9 and tax lot 46.7-1-15" on the map titled "Final Subdivision Plat" [105] that was filed in the Rockland County Clerk's Office on September 10, 2013 as Map No. 8212.  Neither the metes and bounds description nor the Final Map carves out the Causeway that spans Cranberry Lake.  It therefore cannot be disputed that the Causeway and the road on it are part of H.O.A. Common Area #9 and thus that title to the Causeway and the road on it was to be transferred to the PLHA under the 2004 Agreement.  The conditions for the

---

[102] *Rivera v. Bruzzese*, 93 A.D.3d 1124, 1126 (3d Dept. 2012) (citing *Iovine v. Caldwell*, 256 A.D.2d 974, 977 (3d Dept. 1998)).
[103] 8 Warren's Weed, New York Real Property, 5th Ed. § 90.03.
[104] *Id*. (citing *Eliopoulos v. Miller*, 259 A.D.2d 943 (3d Dept. 1999)).
[105] That is, the Final Map.

release of the Bill of Sale and the Bargain and Sale Deed and the recording of the Bargain and

Sale Deed under the 2004 Agreement having occurred years ago, the PLHA cannot frustrate the

obligation of the Escrow Agent to cause such release and the transfer of the property of record to

the PLHA.

### B.  Maintenance and Repair of the Causeway and the Road on It

Section 9 of the 2004 Agreement states that "Upon [Potake Lake, L.L.C.'s] delivery of

the initial form of the [Bargain and Sale Deed] . . . to be held in escrow, . . . the PLHA shall

assume, shall be deemed to have assumed, and shall be solely responsible for all rights and

obligations, including maintenance and repair obligations for Cranberry Lake, the Cranberry

Lake Dam, the Spillway, and all appurtenant facilities without the execution of all further

documents.  Neither Pierson nor Rock Hill nor [Potake Lake, L.L.C.] shall thereafter have any

obligations with respect to Cranberry Lake and the Cranberry Lake dam and spillway other than

as lot(s) owners." [106]

Section VI of The Sixteenth Amendment to the Offering Plan similarly states that "PLHA

is solely responsible for all rights and obligations, including maintenance and repair obligations

for Cranberry Lake, Dam and Spillway and all appurtenant facilities.  The New Sponsors shall

not have any obligations with respect to Cranberry Lake, dam and spillway other than as Lot

Owners." [107]

Taken together, and notwithstanding the regime that applied under the original Offering

Plan, these agreements therefore would make the PLHA responsible upon delivery of the initial

Bargain and Sale Deed in April 2004 or at the latest upon entry into the Sixteenth Amendment

on July 23, 2004 for all maintenance and repair obligations for the "appurtenant facilities" to

---

[106] *See supra* note 85.
[107] Rice Decl. Ex. 13, p. 7.

Cranberry Lake. Based on the definition of "appurtenant," this would include the Causeway but not the road on it. *Black's Law Dictionary* defines "appurtenant" as "[a]nnexed to a more important thing," and it is clear that the Causeway is less important than the lake it crosses; it would not have been built but for the lake. [108] The word also is taken to mean an accessory to something else and related or attached to or running with land described that is not as important as such land but is connected to its use and enjoyment.[109] This, too, would apply to the Causeway vis-à-vis the lake, or, perhaps more aptly, the land at the bottom of the lake upon which the Causeway rests. On the other hand, the road across the Causeway is not attached to the lake/lakebed; it is attached to the Causeway, which is the more important thing as between the Causeway and the road. If anything, then, the road is appurtenant to the Causeway, not the lake.

The conclusion that the road across the Causeway is not an "appurtenant facility" to Cranberry Lake therefore directs one away from the 2004 Agreement and the Sixteenth Amendment to the parties' other agreements to determine which of them is responsible for maintenance and repair of the road on the Causeway.

As noted, Sterlington Road, via the Causeway, connects Phase 1 of Pierson Lakes with Phase 3 and is in the Phase 3 Common Area. Under the original Offering Plan, which in this respect has not been modified by the parties' other agreements, the Sponsors are obligated to maintain the stretch of Sterlington Road that crosses the Causeway until such time as "prior to the closing of title to the first Lot in Phase 3,"[110] which has not yet occurred. As discussed

---

[108] *Appurtenant*, Black's Law Dictionary 123 (10th ed. 2014).
[109] *United States v. Fagan*, 577 F.3d 10, 13-14 (1st Cir. 2009), *cert. denied sub nom. Fagan v. United States*, 559 U.S. 958 (2010); *1500 Range Way Partners, LLC v. JPMorgan Chase Bank, N.A.*, 800 F. Supp. 2d 716, 720-21 (D. S.C. 2011).
[110] Gueyikian Aff., Ex. C, p. 3.

above,[111] and as the Sponsors' counsel stated during oral argument on December 14, 2020, "[i]t's

simply when the first lot to Phase 3 is sold, that's when they [PLHA] get the roads."[112]

In addition, although the Offering Plan provides that "[a]ll private streets and roads in the

Development will be owned and maintained by the Association," the Sponsors promised that

prior to the transfer of ownership of a Common Area to the PLHA "[a]ll street work, materials,

construction methods and workmanship in the Development [would] conform with the

specifications approved by the Town of Ramapo as follows:

> i)    Paving:        compacted subgrade
>                      4" asphalt concrete base course
>                      1 ½" asphalt concrete binder course
>                      1" asphalt concrete wearing course
>        Roads will be 22 feet wide with 2-foot stabilized
>        shoulders on each side.[113]

And the Declaration also provides that "the Common Areas and all facilities now or hereafter

built or installed thereon, shall at all times be maintained in good repair and condition and shall

be operated in accordance with high standards.  The maintenance and repair of the Common

Areas shall include, but not be limited to, the maintenance and repair of damage to roadways . .

."[114]  Unless Potake Lake, L.L.C. makes any necessary repairs to bring the road to the condition

in which it should have been maintained under the Offering Plan and the Declaration before

transfer to the PLHA of the Common Area in Phase 3, therefore, Potake Lake, L.L.C will not

have complied with the operative Controlling Documents[115] notwithstanding the parties' 2004

Agreement, the Sixteenth Amendment, and the Bargain and Sale Deed transferring the Causeway

---

[111] *See supra* n. 52.
[112] ECF No. 53 (December 14, 2020 Hearing Transcript) at p. 7.
[113] Gueyikian Aff., Ex. C, p. 15.
[114] Rice Decl., Ex. 3, p. 7.
[115] *See also* ECF No. 83 (July 14, 2021 Hearing Transcript), at p. 32 (acknowledgement by Sponsors' counsel, Mr. Sarajian).

and road on it to the PLHA.  Instead, it would have to bring the road up to the standard required

by the Offering Plan and the Declaration.

**Conclusion**

For the foregoing reasons, the motions for summary judgment are granted in part and

denied in part.  Counsel for PLHA shall email a proposed order and judgment to chambers (a)

declaring PLHA the owner of the Causeway and the road on it since January 20, 2014 and

directing the release from escrow of the Bill of Sale and the recording of the Bargain and Sale

Deed, (b) declaring that since the delivery of the initial form of the Bargain and Sale Deed in

April 2004, PLHA has had the maintenance responsibility for the Causeway, and (c) declaring

that until the sale of the first lot in Phase 3, Potake Lake, L.L.C. has the maintenance obligation

for the road on the causeway and must deliver the road to the PLHA in the condition required by

the Offering Plan and the Declaration.  Upon entry of the foregoing order and judgment, this

adversary proceeding will be closed.

Dated:  White Plains, New York
      January 14, 2022                */s/Robert D. Drain*
                                United States Bankruptcy Judge